UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 19 CR 351 |
| v. | ) | |
| | ) | Judge Sharon Johnson Coleman |
| ANTONIO CARRAZCO-MARTINEZ, | ) | |
| JUAN MANUEL BARENAS-REYNOSO, | ) | |
| and NICOLASA BENITEZ DENOVA | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

On April 28, 2023, a jury found defendants Antonio Carrazco-Martinez, Juan Manuel Barenas-Reynoso, and Nicolasa Benitez Denova guilty of conspiracy to knowingly and intentionally possess with intent to distribute five kilograms or more of cocaine and one kilogram or more of heroin from approximately May 2016 to August 2017. The jury also issued a guilty verdict for Carrazco-Martinez and Benitez Denova for possession with intent to distribute five kilograms or more of cocaine and one kilogram or more of heroin on November 18, 2016, a guilty verdict for Barenas-Reynoso for possession with intent to distribute 500 grams or more of cocaine on February 8, 2017, and a not guilty verdict for Barenas-Reynoso for possession with intent to distribute five kilograms or more of cocaine on August 23, 2017. All three defendants have filed post-trial motions with the Court, seeking judgments of acquittal or, in the alternative, a new trial. For the following reasons, the Court denies each motion [553][557][560].

**Background**

In May 2021, a special grand jury issued an indictment,[1] naming Carrazco-Martinez, Barenas-Reynoso, and Benitez Denova as members of a conspiracy to distribute five kilograms or more of cocaine and one kilogram or more of heroin. This conspiracy surrounded another individual—

---

[1] This indictment was the second superseding indictment of the case. The Court focuses on it because it was the operative indictment for trial.

1

Pablo Anibal Vazquez-Duarte, a/k/a Compa, who allegedly led a drug trafficking operation. The indictment named other members of the conspiracy as well, some of whom were witnesses at trial.

*Pre-Trial Motions*

Before the case went to trial, the Court ruled upon several pretrial motions to exclude evidence. First, Barenas-Reynoso filed a motion to suppress evidence stemming from his April 25, 2019 arrest. He contended that he had not voluntarily given officers consent to search his home and that any subsequently discovered evidence and disclosed statements should be suppressed. During this search, the Government found a drug ledger which the Government maintained reflected drug transactions. Furthermore, in the post-arrest interview, Barenas-Reynoso told officers that he was involved in drug trafficking and used garages to help facilitate the activities. The Court held a motion hearing on this issue and ruled that Barenas-Reynoso's consent was knowing and voluntary, denying his motion. This evidence was later introduced at trial.

Second, Carrazco-Martinez filed a motion to suppress evidence. During the agents' investigation into the drug conspiracy, the Government applied for a warrant to use a cell-site simulator, a device which can collect information from nearby telephones. It sought this device to identify the phone number used by Carrazco-Martinez. The Chief Judge issued a warrant and the Government was able to track his location, leading agents to a house and associated garage. The Government installed a pole camera across the street and in other nearby areas, ultimately obtaining a warrant to install closed circuit television ("CCTV") footage inside the garage. Carrazco-Martinez sought to suppress evidence from the pole cameras, cell-site simulator, and CCTV footage. The Court denied the motion, finding that the pole camera did not invade his reasonable expectation of privacy and that the officers permissibly acted in good faith in accordance with the warrants.

Later on, the Government filed a *Santiago* proffer. Upon the Court's order, the Government supplemented their proffer and this Court conditionally granted it. Finally, in advance of trial,

Benitez Denova filed a motion to exclude her name and alleged alias, "Lio," from several of the Government's proposed exhibits. The Government intended to include exhibits showing text message conversations sent over a Blackberry Messenger Application. During the investigation, the Government received intercepts of raw data of the conversations. The raw data included the screennames associated with the accounts sending the messages and the content of the messages themselves. The Government's translator translated the messages from Spanish to English. To present the messages at trial, the Government compiled the raw data into a chart. Each line of the chart included the original screenname for the individuals sending the messages. The Government argued that one screenname—Lio—was connected to Benitez Denova, and it wanted to include her name at the top of the exhibits. She objected. Upon hearing from both parties, the Court permitted the Government to include the screennames on the exhibits and allowed the Government to include her name at the top of the exhibits so long as the Government provided the proper foundation linking her to the screenname before introducing the exhibit to the jury.[2] The Court further stressed that these charts could only be used as demonstrative evidence.

*Trial*

The case went to a jury trial in April 2023. The trial lasted two weeks, and the Government brought forth various witnesses to prove their case. For the purposes of this Opinion, the Court summarizes the events most relevant to the disputes set forth in the parties' pending motions.

After the Government gave its opening statement, each defendant gave their individual opening arguments. In Benitez Denova's opening, counsel mentioned that his client met with Carrazco-Martinez, sent him a few text messages, and questioned whether Carrazco-Martinez gave her a backpack. He also referred to Carrazco-Martinez by a nickname, Sebastian. Immediately after

---

[2] Carrazco-Martinez made similar objections, which the Court also overruled. He does not further discuss those objections as the basis for his post-trial motion.

the defendants gave their statements, and outside the presence of the jury, Carrazco-Martinez moved to sever the trials, and in the alternative, for a mistrial. He contended that counsel's statements during opening argument improperly implicated him. After counsel's forceful argument, the Court concluded that the statements were permissible, consistent with mere "finger pointing," and allowed the case to continue against the three co-defendants.

Throughout the case, the Government repeatedly brought Agent Jennings, one of the case investigators, to the stand. He explained how the Government had intercepted the blackberry messenger communications via wiretap and collected the raw data, discussing how this data included the users' screennames. He also testified as to who, based on surveillance and other aspects of the Government's investigation, was associated with the screennames. Over the course of trial, he read various text message conversations into evidence, after the Court gave a limiting instruction.

The Government put forth evidence showing that on October 4, 2016, the DEA seized a vehicle driven by two co-conspirators, Ignacio Cordova and Melchor Cardenas,[3] and seized 15 kilograms of cocaine and over $400,000 hidden in trap compartments and suitcases in the car. Cardenas later testified at trial, explaining how these drugs came from a garage used to load drugs. Cardenas also identified Barenas-Reynoso and explained how that he similarly used garages as stash houses to conduct drug operations in Chicago.

The Government called a confidential informant, Rudy Acosta, to the stand, who testified as a former member of the conspiracy. Acosta explained that after the October drug seizure, he communicated with Compa, who explained that another individual—"el Borrega"—would come to Chicago to handle operations. Acosta identified Carrazco-Martinez as "el Borrega." Thereafter, Acosta and Carrazco-Martinez communicated with each other and Acosta recounted several of these exchanges to the jury.

---

[3] These individuals appear to have swapped driving the car along the way on this day.

Various other witnesses discussed the next events in the alleged conspiracy. The jury was shown texts indicating that "Sebastian," the screenname the Government argued was associated with Carrazco-Martinez, messaged Compa about a shipment from Texas, coming from an individual named "Lio." Two co-conspirators, J'Anthony Lara and Oscar Martinez-Galvan, testified about how their actions were coordinated by Benitez Denova, whose nickname was "Lio."

The first part of this trip occurred in early November 2016. According to the trial testimony, Benitez Denova hired Lara to drive a blue ford mustang from Texas to Chicago, while Benitez Denova drove a separate red car. On November 3, 2016, Benitez Denova arrived at a Target parking lot in Chicago in a red car and Lara arrived in a blue mustang. This arrival was corroborated by messages. For instance, the Government showed messages where "Sebastian" texted "Lio" to leave Lara in the car and to move her things from the blue car to the red car. Lara testified that he moved these items, and DEA agents surveilling the Target saw Benitez Denova enter the Target. They also saw and photographed Carrazco-Martinez at this Target.

The Government proffered additional evidence indicating that Carrazco-Martinez and Benitez Denova met, and Carrazco-Martinez took the blue ford mustang. Later messages showed that Carrazco-Martinez started to work on the car. At one point, "Sebastian" messaged Compa to ask if he should stop working, but Compa instructed him to continue, asking how anyone could know what they were doing. Later, Lara testified that he and Benitez Denova met with Carrazco-Martinez to receive the blue mustang back, and that Benitez Denova received a bag of cash. During cross-examination, Lara was questioned about that bag of cash.

Lara then testified that Benitez Denova sent him to Mexico with the blue mustang. While in Mexico, Lara explained that individuals took the blue mustang, and that he handed a phone to someone who confirmed the person speaking on the other line was Benitez Denova. The Government did not present other evidence to corroborate this point, such as accessing his phone

5

records. Lara later drove the blue mustang back to Texas and picked up Martinez-Galvan to drive the car north. Martinez-Galvan testified that Lara checked in with "Lio" during the drive.

While they drove, blackberry messages showed that Carrazco-Martinez spoke with Compa. "Sebastian" asked Compa if "Lio" would be coming, to which Compa said no. The Government presented more messages discussing Lara's drive back to Chicago, where he planned to meet at a Marriot parking lot. On November 18, messages indicated that "Sebastian" told "Lio" to ask Lara to stop and eat first, so that he did not arrive before "Sebastian" did, and agents saw Lara enter a Buffalo Wild Wings. He then drove the blue mustang to the Marriot parking lot. Agents stopped and searched the vehicle and found trap compartments with 6.97 kilograms of cocaine and 6.82 kilograms of heroin. Agents testified that they saw Carrazco-Martinez drive by the lot at this time and pull away.

The Government also introduced evidence about events from December 2016 and January 2017. Compa and another account associated with Carrazco-Martinez discussed a shipment. Carrazco-Martinez then received a white Chevy Traverse at a garage in Carpentersville. As discussed above, law enforcement put CCTVs in this garage, and that video depicted Carrazco-Martinez and associates loading and unloading items from the white Chevy Travesre. Agents put a tracker on this car, and it was later stopped in Texas, where agents discovered $530,000 in hidden trap compartments. Carrazco-Martinez was not near the car at the time of the stop.

The Government also introduced pole camera video from February 8, 2017. This video showed an individual retrieving a bag from a car and walking into a garage located on North Francisco Avenue. Agent Asselborn, who had been tasked with investigating the case, testified that he remotely watched these events occur through this video. He stated on direct examination that he knew it was Barenas-Reynoso on the video, but admitted on cross-examination that he could not definitively determine who he saw in the video. That night, DEA agents seized a bag with 5

kilograms of cocaine from the car in this garage. Per Agent Jennings' testimony, Bareneas-Reynoso acknowledged using a garage on North Francisco Avenue for storing narcotics during his post-arrest interview.

A few other facts are relevant to this Opinion. Officers testified that Fermin Campos, another co-conspirator, was surveilled outside a hotel on May 16, 2017. The next day, Benitez Denova was seen at that same location, picking up individuals to get lunch. Then, law enforcement searched a nearby stash house, where they found a drug ledger that listed payments to "Leo." The Government also detailed events from August 2017, but given that Barenas-Reynoso was acquitted on that Count, the Court does not further detail them here.

At the end of trial, the Government called Agent David Pina to the stand as an expert witness. During his testimony, he explained, through his experience working in investigations into drug trafficking organizations, his understanding of the meaning of words used in the messages shown to the jury.

**Legal Standards**

Defendants seeking a post-trial judgment of acquittal face an extremely high hurdle. *United States v. Vizcarra-Millan*, 15 F.4th 473, 506 (7th Cir. 2021). When assessing Rule 29(c) motions, courts "view the evidence in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." *United States v. Wallace*, 991 F.3d 810, 812 (7th Cir. 2021). In doing so, courts do not re-weigh the evidence or second-guess credibility determinations and make all reasonable inferences in the government's favor. *United States v. Ginsberg*, 971 F.3d 689, 695 (7th Cir. 2020).

Rule 33 authorizes district courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Granting a new trial is "reserved for only the most extreme cases," and courts "approach such motions with great caution." *United States v. Coscia*, 4

F.4th 454, 465 (7th Cir. 2021) (citations omitted). "The applicable standard under Rule 33 requires a new trial 'only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict.'" *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019) (quoting *United States v. Flournoy*, 842 F.3d 524, 530 (7th Cir. 2016)). "The ultimate inquiry is whether the defendant was deprived of a fair trial." *United States v. Friedman*, 971 F.3d 700, 713 (7th Cir. 2020) (citation omitted). District courts have considerable discretion in determining Rule 33 motions. *Id. at* 716.

**Discussion**

Defendants provide the Court with various arguments regarding why a judgment of acquittal, or a new trial, is appropriate. The Court will address each defendant's motion in turn.

<u>Carrazco-Martinez's Post-Trial Motion</u>

Carrazco-Martinez contends that acquittal is warranted because no rational juror could have convicted him on either count. In his summary of the evidence shown at trial, he focuses on two events: (1) the November 3 event at the Target store and (2) the CCTV footage of him working on the Chevrolet Traverse. In so doing, he highlights that the agents did not see him in the mustang, that he was not seen arriving at the Target, and that he was not in or near the mustang or traverse when either vehicle was stopped by law enforcement. Carrazco-Martinez discusses the gap of time between the November 3 and November 18 seizure of the drugs in the blue mustang, and how witnesses could not definitively explain his activity in the Traverse. Crucially, Carrazco-Martinez does not testify as to the blackberry messages beyond calling them "a series of conversations through the now defunct Blackberry Messenger application" which were "unintelligible, absent the government's own interpretation." (Dkt. 557 at 4.) Carrazco-Martinez provides no legal support for why the jury should not have relied on these messages. The Government provided the jury with sufficient evidence to conclude that Carrazco-Martinez was culpable for the November 2016 drug seizure and the conspiracy at large through his numerous messages to Benitez Denova and Compa

8

about the status of the operation and the government surveillance at both the Target store and Marriot parking lot. Carrazco-Martinez's involvement in the conspiracy was further bolstered by the actions he took at the Carpentersville garage, seen through the CCTV footage. In sum, Carrazco-Martinez is not entitled to a judgment of acquittal.

In the alternative, Carrazco-Martinez requests a new trial. Carrazco-Martinez first argues that he is entitled to a new trial because the Court gave jury instructions that violated his sixth amendment rights. "[T]o receive a new trial based on erroneous instructions, a defendant 'must show both that the instruction did not adequately state the law and that the error was prejudicial to [him] because the jury was likely to be confused or misled.'" *United States v. White,* 443 F.3d 582, 587 (7th Cir. 2006) (citation omitted); *see also United States v. Anzaldi*, 800 F.3d 872, 880 (7th Cir. 2015). Carrazco-Martinez contends two instructions were improper: (1) that the Court erred when it told the jury that the Government did not have to prove drug quantity or weight to come to a guilty verdict; and (2) that the Court improperly gave an "aider and abettor" instruction regarding his conduct.

There was significant disagreement regarding whether to read the following non-pattern jury instruction ("Instruction No. 28"):

> The government is not required to prove that the offense charged in Count One, Two, Three, or Four involved the specific quantity of a substance alleged in those counts in order to prove a defendant's guilt on any of those counts. However, the government must prove that each of those counts involved some measurable quantity of the cocaine.

(Dkt. 541 at 31.) The Court finds that this is a proper statement of the law, as the Seventh Circuit has found that drug type and quantity are not considered elements of the offense. *See United States v. Garcia*, 580 F.3d 528, 535 (7th Cir. 2009); *United States v. Kelly*, 519 F.3d 355, 363 (7th Cir. 2008). Carrazco-Martinez argues that the instruction runs contrary to *Alleyne v. United States*, 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), which found that any fact increasing the mandatory

9

minimum must be submitted to the jury. *Id.* at 112. But the Court complied with *Alleyne*, because the jury *was* instructed to determine the quantity of the drug proven by the Government through the next instruction, (*see* Dkt. 541 at 32.) and through filling out the special verdict form. Combined, these jury instructions informed the jury that a defendant could be found guilty of the charged offenses without the government establishing a specific quantity or type of drug, but that the jury nevertheless had to make a finding of what they believed the Government proved.

Regardless, Carrazco-Martinez was not prejudiced. The jury *did* make the finding that he possessed five kilograms or more of cocaine and one kilogram or more of heroin, which is the necessary finding to establish the mandatory minimum offense. The Court acknowledges that Instruction No. 28 is not a pattern jury instruction. But pattern jury instructions are "not intended to be used mechanically and uncritically." *United States v. Edwards*, 869 F.3d 490, 497 (7th Cir. 2017). This non-pattern instruction helped explain the nuance of the law to the jurors. Therefore, the Court finds that Carrazco-Martinez is not entitled to a new trial because this instruction was given.

The Court next considers whether it properly gave the aider and abettor instruction to the jury, which, unlike Instruction No. 28, is a pattern jury instruction. *See The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit*, § 5.06 (2020 ed.). Carrazco-Martinez argues no one testified that he was seen exchanging drugs for money, and further the Government failed to show evidence of any direct communications between him and anyone who handled narcotics, such as Lara or the drivers of the White Chevrolet. Nevertheless, the Court finds there was sufficient evidence to give this instruction based on the other evidence provided at trial, including the blackberry messages coordinating Lara's drug run. Again, Carrazco-Martinez argues, without support, that the messages have no meaning and are not reliable. This conclusory assertion is simply not enough to put this evidence into doubt. The Seventh Circuit has repeatedly clarified that underdeveloped and merely perfunctory arguments like this are waived. *See United States v. Hassebrock*,

663 F.3d 906, 914 (7th Cir. 2011) (finding the argument was "decidedly underdeveloped and therefore waived"); *United States v. Foster*, 652 F.3d 776, 793 (7th Cir. 2011) ("As we have said numerous times, underdeveloped arguments are deemed waived[.]") (internal quotation marks omitted). The Court will not grant a new trial on this basis.

Carrazco-Martinez also argues that the Court erred in admitting evidence obtained through CCTV cameras and digital analyzers. He rests on the arguments the Court already rejected, but also opines that the Government omitted information from its warrant applications. Regarding the digital analyzer, Carrazco-Martinez argues that the Government did not disclose that the digital analyzer would pull information from *all* devices in the area, including innocent people. As shown by the Government in its response brief, the Government *did* detail the expansive nature of the digital analyzer in its warrant application, as well as its attempts to minimize its impact. Carrazco-Martinez also maintains that the Government overstated the need for the CCTV camera inside the garage given the other evidence they had available to them. Yet, Carrazco-Martinez fails to show why this means the Government was not entitled to this evidence and does not provide any case law to support his argument. The Court is unconvinced the prior ruling was in error and does not grant his motion on this basis.

Lastly, the Court considers whether Carrazco-Martinez is entitled to a new trial due to his co-defendant's "antagonistic" defense. Carrazco-Martinez argues that Benitez Denova continuously implicated Carrazco-Martinez in the case, therefore infecting his right to a fair trial. Carrazco-Martinez maintains that Benitez Denova's counsel continued to ask questions with the intent to blame him for the underlying conduct, including by publishing government exhibits of communications he purportedly had with other members of the conspiracy and by objecting to his cross-examination questions. He thus claims Benitez Denova undermined Carrazco-Martinez's

11

attempt to show that the Government failed to prove his identity, therefore depriving him of a fair trial.

The Supreme Court addressed a similar issue in *Zafiro v. United States*, 506 U.S. 534, 113 S. Ct. 933, 122 L. Ed 2d 317 (1993). There, the Court concluded that "[m]utually antagonistic defenses are not prejudicial *per se*" and that severance is only appropriate "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment against guilt or innocence." *Id.* at 539. The Court provided various examples of when severance may be appropriate: when evidence would not have been admitted against a co-defendant if tried alone, when there are different degrees of culpability, and if evidence is probative but only technically admissible against a codefendant. *Id.* In *Zafiro*, where the government argued all defendants were guilty, there was sufficient evidence of guilt for all defendants, and the Court emphasized the importance of establishing guilt as to all defendants, the prejudice was lessened. *Id.* at 540–41.

The *Zafiro* holding clearly applies in this case. Although Benitez Denova pointed to Carrazco Martinez's conduct, her statements did not rise to a level beyond mere finger pointing, which is not enough to warrant severance or a new trial. *United States v. Hughes*, 310 F.3d 557, 563 (7th Cir. 2002) (denying the motion to sever where co-counsel attempted to "shift blame to him through argument and cross-examination"). Carrazco-Martinez failed to show he faced actual prejudice here, especially given that the Government also provided the same exhibits to the jury. For the above reasons, the Court denies Carrazco-Martinez's motion in its entirety.

Benitez Denova's Post-Trial Motion

Benitez Denova also moves for acquittal. The Court finds, based on the evidence detailed above, that there was sufficient evidence for the jury to find a verdict on every element of the offense. Although she points to issues she finds with the evidence, the Court does not find that

12

these issues justify acquittal. Benitez Denova contends that inconsistencies in Lara's testimony, the lack of evidence corroborating her phone call in Mexico, and the Government's attempt to connect a ledger with the name "Leo" to herself indicate the various ways the government took "liberties" with the evidence. She similarly criticizes the Government's attempt to connect her presence at a hotel in May 2017 with the conspiracy. Nevertheless, the Court finds there was enough evidence to convict. In particular, two witnesses identified Benitez Denova as Lio, and the jury reasonably accepted their testimony. They testified as to Benitez Denova's role in coordinating their actions, specifically the drive from Mexico to Chicago in a car in which the police discovered nearly 7 kilograms of cocaine and 7 kilograms of heroin. On a motion for judgment of acquittal, the court must view the evidence in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. Fed. R. Crim. P. 29(a, c); *United States v. Garcia*, 919 F.3d 489 (7th Cir. 2019). Here, that standard is clearly met. For the same reasons, the Court sustains its denial of Benitez Denova's motion for a directed verdict.

  Benitez Denova also cites numerous reasons why a new trial is warranted. As the government stresses, many of these arguments are underdeveloped, such that waiver is appropriate. *See White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[P]erfunctory and underdeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived."). Nevertheless, the Court will attempt to address each contention in turn.

  First, Benitez Denova maintains that the Court erred by failing to exclude her name and alleged alias from the blackberry messages, arguing the texts were not properly authenticated. Federal Rule of Evidence 901 requires the proponent of the evidence to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." She argues that by

13

including her name and alias on the exhibits, the Government improperly "doctored"[4] the original messages and placed the burden on her to demonstrate how she was *not* the individual connected with the message. According to Benitez Denova, her defense was severely undermined when the Court admitted this evidence because jurors were more likely to believe this written evidence.

The Court disagrees. The Court questions Benitez Denova's reliance on Federal Rules of Evidence 901(b)(5)–(6). Because these were written messages, it is not clear how these provisions would apply given calls and voice identification are not at issue. Regardless, the Court finds that the information was properly authenticated at trial. The screenname was not "doctored" by the Government, given it came from the original raw data. And the Government provided sufficient corroborating evidence to connect "Lio" with Benitez Denova. *See United States v. Breland*, 356 F.3d 787, 795 (7th Cir. 2004) (allowing the speakers' name on the transcript when they sufficiently identified the names). Finally, the Court provided a limiting instruction, reminding the jurors that the exhibits were demonstrative aids and the jury had to determine if the identifications were accurate, and not simply rely on the Government's purported identifications. Benitez Denova states, without explaining how, that the instruction was rewritten by the Court to the Government's advantage. The Court drafted the instruction to clarify the issues for the jury. Lastly, to the extent Benitez Denova relies on any previously asserted arguments made in Court, the Court rejects them.[5]

Benitez Denova also argues that the Court improperly included "association" evidence at trial. The Government pointed out that she did not identify any such evidence, and Benitez Denova did not provide further context in her reply. The Court thus is unsure which evidence was improperly admitted and denies the motion on this basis.

---

[4] In response, Benitez Denova suggests that the translations themselves were improper iterations. This argument lacks substantiation and the Court does not consider it further.

[5] Benitez Denova also argues that it was wrong for the Court to admit conversations from co-conspirators through the *Santiago* proffer. The Government claims that it did not introduce any of these statements at trial for the truth of the matter asserted. Benitez Denova drops this argument in her reply, and thus the Court does not consider it further.

In her motion, Benitez Denova renews her contention that it was improper for the Government to call DEA Agent David Pina as an expert during trial. Specifically, she argues that Pina was not a party to these messages and should not have been allowed to testify on the state of mind of another person. *See United States v. Glober*, 479 F.3d 511, 516 (7th Cir. 2007) (discussing how law enforcement cannot testify as to "some special knowledge of defendant's mental processes" but can testify on "common criminal practices" (internal citation omitted)). The Government argues that the Court limited his testimony, and that he permissibly testified on the meaning of the words in his messages based on his knowledge of common criminal practices. *See United States v. Bahena*, 71 F.4th 632, 635 (7th Cir. 2023) (explaining how experts can explain "code words" used in criminal enterprises). Benitez Denova does not explain how this testimony was prejudicial, and without further argument, the Court therefore denies her motion.

Furthermore, Benitez Denova argues that the Court improperly denied her right to confront witnesses; specifically, her ability to cross-examine Martinez-Galvan about whether he violated his bond conditions. She argues that the counsel was unable to properly cross-examine the witness on the extent of benefits the Government provided for testifying. The Government argues that she was able to engage in fulsome cross-examination of the witness. The Court agrees and finds that Benitez Denova had the chance for effective cross-examination, including on the bond revocation. Although the Court did sustain some objections to form and relevancy, counsel was otherwise able to cross examine on the issue. A new trial is not warranted on this basis.

Next, Benitez Denova argues that several of the Court's jury instructions were improper and requires a new trial. First, she argues that the Court erred in refusing to provide the "mere presence" instruction she requested. Benitez Denova maintains that there were instances, such as the November 3 incident at the Target and the May 16 incident where she had lunch near the location Campos had been the night before, that only showed her "mere" presence at the scene.

15

The Government contends that because Benitez Denova was only charged with one substantive charge, possession, unrelated to either incident, the instruction was not necessary. The Court agrees, particularly given that it gave an instruction regarding the necessity of knowledge to commit an offense, such that "the jury could not have found [Benitez Denova] guilty if it believed that [s]he was merely present." *United States v. James*, 464 F.3d 699, 707 (7th Cir. 2006). Therefore, the Court denies the motion for a new trial on this ground.

Similarly, the Court does not find that a new trial is appropriate because it gave a "lack of mistake" instruction for Agent Pina. This instruction informed the jury not to accept his testimony but to judge it the same as others. Thus, as the Government points out, it *helped* Benitez Denova, if anything. Furthermore, the Court rejects Benitez Denova's arguments about the aiding and abetting instruction and Instruction No. 28 for the same reasons expressed above. There was sufficient information introduced into evidence to permit an instruction for aiding and abetting and Instruction No. 28 assisted the jurors to understand the law. Lastly, the Court finds it was not error to provide Instruction No. 32, which instructed the jury that intent to distribute could be demonstrated through a quantity of drugs larger than needed for personal use, *see, e.g., United States v. Puckett*, 405 F.3d 589, 601 (7th Cir. 2005), as that is a correct statement of law and Benitez Denova has not demonstrated any resulting prejudice.

Benitez Denova next argues that the Court erred during oral arguments. For instance, she asserts that the Court improperly cut of her objection. Outside of this assertion, there is no reference as to when this occurred. Regardless, Benitez Denova herself admits that the Court reminded jurors not to take the lawyers' statements as evidence, such that any harm done was rectified in the moment. Similarly, she fails to identify how her defense was prejudiced. It is unclear what was left unsaid. Her remaining arguments about impropriety of the government's arguments

were mere generalizations and not fully developed or based on any specifics in the record. For all the above reasons, the Court denies Benitez Denova's motion for a new trial.

Barenas-Reynoso's Post-Trial Motion

Barenas-Reynoso moves for judgment of acquittal, arguing that there was insufficient evidence admitted at trial to demonstrate his guilt on either count. Barenas-Reynoso points to the Government's failure to introduce any evidence that he communicated with anyone to accomplish the conspiracy; specifically, there were no text messages that he purportedly sent. Furthermore, Barenas-Reynoso claims the ledger is insufficient evidence of corroboration. The Court finds that the Government produced sufficient evidence, either in the form of his own admissions or through Cardenas' testimony, to establish his role in the conspiracy. The ledger was also sufficiently corroborated through additional trial testimony. As for the possession count, Barenas-Reynoso argues that Agent Asselborn could not definitively identify him on the pole camera video. Yet, the video itself, alongside Asselborn's in court identification, testimony where he explained seeing Barenas-Reynoso in the same car, and discussion of his post-arrest statements, provided the jury with sufficient evidence to reasonably to find he was guilty on Count III. Therefore, the Court does not find that acquittal is warranted.

In addition, Barenas-Reynoso argues that since the jury acquitted him on Count IV, this undercuts the other two findings of guilt. He cites no case law in support of this argument, and the Court does not find that this verdict is incompatible with the jury's other findings of guilt. Therefore, Barenas-Reynoso's motion for acquittal is denied.

Barenas-Reynoso seeks a new trial. He first argues the Court erred in its June 2021 ruling on the motion to suppress, raising the same arguments the Court previously rejected. The Court affirms its prior finding and denies his motion for a new trial on this basis.

17

Regarding jury instructions, Barenas-Reynoso adopts the objections made by his co-defendants' counsel at trial and in their post-trial motions. For the reasons expressed above and explained during trial, the Court does not grant a new trial. Similarly, Barenas-Reynoso reincorporates all arguments made during trial; the Court does not grant a new trial on these unspecified grounds. Barenas-Reynoso's motion is denied in full.

**Conclusion**

For the above reasons, the Court denies each defendant's motion. The Court commends all parties for a well-argued trial and their dedication to their clients.

IT IS SO ORDERED.

Date: 11/7/2023

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge